*Formatted for Electronic Distribution*                                    *Not For Publication*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF VERMONT

_____

In re:

    Charles M. Kail and                        Chapter 13 Case
    Cheryl L. Kail,                            # 09-10796

             Debtors.

Filed & Entered
On Docket
July 22, 2011

_____

Charles M. Kail and
Cheryl L. Kail,

             Plaintiffs,

    v.                                         Adversary Proceeding
United States of America and                # 09-1037
Vermont Federal Credit Union,

             Defendants.
_____

| | |
|---|---|
| *Appearances:*    Nancy M. Geise, Esq. | Karen E. Wozniak, Esq. |
|                        Kolvoord Overton & Wilson | United States Department of Justice |
|                        Essex Junction, VT | Washington, DC |
|                        *For the Debtors* | *For the United States of America* |
| | Alexandra E. Edelman, Esq. |
| | Kevin M. Henry, Esq. |
| | Gary F. Karnedy, Esq. |
| | Douglas J. Wolinsky, Esq. |
| | Primmer Piper Eggleston & Cramer |
| | Burlington, VT |
| | *For Vermont Federal Credit Union* |

## MEMORANDUM OF DECISION
### DENYING MOTIONS FOR SUMMARY JUDGMENT

       Charles M. Kail and Cheryl L. Kail (the "Debtors") filed a complaint (doc. # 1) to initiate this adversary proceeding against the United States of America (the "United States") on October 26, 2009, and filed an amended complaint (doc. # 3) to add Vermont Federal Credit Union ("VFCU") as a defendant on October 29, 2009. The United States filed an answer on December 9, 2009 (doc. # 9), and VFCU filed an answer on December 11, 2009 (doc. # 10). On January 7, 2011, VFCU, the Debtors, and the United States filed motions for summary judgment (doc. ## 37, 38, 39). The questions presented in the motions for summary judgment are whether, as a matter of law: 1) Debtor Charles M. Kail ("Mr. Kail") is liable to the Internal Revenue Service ("IRS") for penalties assessed under 26 U.S.C. § 6672 for the failure of New

1

York Network, LLC ("NYN") to pay employment taxes; and 2) the 2007 VFCU mortgage takes priority over the 2006 federal tax lien pursuant to the doctrine of equitable subrogation. For the reasons set forth below, the Court denies the parties' motions for summary judgment.

## JURISDICTION

This Court has jurisdiction over this adversary proceeding and the instant motions for summary judgment under 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (K).

## UNDISPUTED MATERIAL FACTS

Based upon the record in this case and adversary proceeding, and pursuant to Vt. LBR 7056-1(a)(3), the Court finds the following facts relating to the 26 U.S.C. § 6672 issue to be material and undisputed:

1. NYN operated a television station in Vermont (doc. # 39-2, ¶ 5; doc. # 48, ¶ 5).
2. NYN was a limited liability company organized in 1994 under the laws of New York; NYN did not have any officers (doc. # 39-2, ¶¶ 6, 18; doc. # 48, ¶¶ 6, 18).
3. On March 1, 1999, Mr. Kail started working for NYN (doc. # 39-2, ¶ 8; doc. # 48, ¶ 8).
4. On April 16, 1999, NYN hired Mr. Kail as its general manager; as general manager, Mr. Kail worked on building sales and oversaw the operation of NYN's property (doc. # 38-1, ¶¶ 1–2, 11(b)[1]; doc. # 39-2, ¶¶ 9–10; doc. # 48, ¶¶ 9–10; doc. # 50-1, ¶¶ 1–2, 11(b)).
5. Mr. Kail's professional job experience prior to joining NYN was in sales and advertising (doc. # 38-1, ¶ 4; doc. # 50-1, ¶ 4).
6. A typical work day for Mr. Kail consisted of making sales calls with sales managers, dealing with programming issues at the station, and contacting vendors (e.g., utility companies, leaseholders) and advertisers; Mr. Kail spent approximately 50–60% of his time on the telephone with advertisers, vendors, and NYN's members (doc. # 38-1, ¶ 3; doc. # 39-2, ¶ 11; doc. # 48, ¶ 11; doc. # 50-1, ¶ 3).
7. Mr. Kail was at the television station on a daily basis (doc. # 39-2, ¶ 12; doc. # 48, ¶ 12).
8. From April 16, 1999, when Mr. Kail became the general manager, to December 2002, when NYN filed its bankruptcy petition, Mr. Kail worked at the television station 50–60 hours per week (doc. # 39-2, ¶ 13; doc. # 48, ¶ 13).
9. When Mr. Kail first started working for NYN in March 1999, Steven Schuyler ("Mr. Schuyler"), the managing partner, and his wife, the bookkeeper, were the only individuals with check signing authority over NYN's bank accounts. Within several weeks of Mr. Kail starting at NYN, Mr. Schuyler and his wife left NYN and the state for an opportunity in the Midwest. When Mr. Kail

---

[1] The Debtor's statement of undisputed material facts erroneously numbered two paragraphs as ¶ 11 (see doc. # 38-1, p. 2). For clarity, the Court has identified the paragraphs as ¶ 11(a) and ¶ 11(b).

    took over as general manager, replacing Mr. Schuyler, he accepted check signing authority over NYN's bank accounts (doc. # 38-1, ¶ 5; doc. # 39-2, ¶¶ 10, 24, 25; doc. # 48, ¶¶ 10, 24, 25; doc. # 50-1, ¶ 5).

10. The following personnel at the television station reported to Mr. Kail:

    a. The television station's two co-operations managers, Scott Aguglia and Johnny Mendez;

    b. The television station's sales manager, Paul Hatin; and

    c. The television station's part-time bookkeeper, Susan Julien ("Ms. Julien")

(doc. # 39-2, ¶¶ 14–16; doc. # 48, ¶¶ 14–16).

11. Mr. Kail did not hire or fire employees at NYN (doc. # 38-1, ¶ 9; doc. # 50-1, ¶ 9).

12. No one on-site at the television station had authority over Mr. Kail; NYN had a management committee to which Mr. Kail reported. At all times during his tenure at NYN, Mr. Kail was under the supervisory authority of the management committee, reported on at least a semi-monthly basis to the management committee concerning the financial situation of NYN, and received directives from members of the management committee for payment of certain bills and as to how certain funds were to be allocated (doc. # 38-1, ¶¶ 10, 19; doc. # 39-2, ¶¶ 17, 19; doc. # 48, ¶¶ 17, 19; doc. # 50-1, ¶¶ 8, 10, 19).

13. The management committee included David Wilkes ("Mr. Wilkes"), Floyd Cox ("Mr. Cox"), and Ray Ploof ("Mr. Ploof") (doc. # 38-1, ¶ 11(a); doc. # 39-2, ¶ 20; doc. # 48, ¶ 20; doc. # 50-1, ¶ 11(a)).

14. Mr. Wilkes lived in New York City and never visited the station after Mr. Kail became the general manager in April 1999. Mr. Cox spent most of his time in Sarasota, Florida, and visited the station and had an in-person meeting or two with Mr. Kail each summer. Mr. Ploof lived in South Burlington, Vermont; early during Mr. Kail's tenure as general manager, he would see Mr. Ploof every three months or so (doc. # 39-2, ¶¶ 21–23; doc. # 48, ¶¶ 21–23).

15. The checkbooks for NYN's bank accounts were kept at the television station and Mr. Kail had access to them (doc. # 39-2, ¶ 35; doc. # 48, ¶ 35).[2]

16. Mr. Kail wrote checks from the company checkbook; either Mr. Kail or the part-time bookkeeper, Ms. Julien, prepared the checks Mr. Kail signed (doc. # 38-1, ¶ 7; doc. # 39-2, ¶ 36; doc. # 48, ¶ 36; doc. # 50-1, ¶ 7).

17. Mr. Kail used his check signing authority to pay vendors, such as UPS Delivery or Federal Express, which required payment at the time of delivery to the television station (doc. # 38-1, ¶ 6; doc. # 39-2, ¶ 36; doc. # 48, ¶ 36; doc. # 50-1, ¶ 6).

---

[2] Pursuant to Vt. LBR 7056-1(a)(3), all material facts in the movant's statement of undisputed facts are deemed to be admitted except to the extent controverted by a statement of disputed material facts filed by the opposing party.

18. From April 16, 1999, when Mr. Kail became the general manager, to December 2002, when NYN filed for bankruptcy, Mr. Kail signed checks on behalf of NYN (doc. # 39-2, ¶ 37; doc. # 48, ¶ 37).

19. The checks that Mr. Kail signed on behalf of NYN include the following:

    a. Check # 1791 dated April 4, 2002 to Al Johnson in the amount of $150.00;

    b. Check # 1280 dated August 12, 2002 to North Valley Cable in the amount of $225.00;

    c. Check # 1314 dated September 6, 2002 to Fred W. Van Buskick, a NYN employee, in the amount of $594.46; and

    d. Check # 1330 dated September 11, 2002 to Central Vermont Public Service in the amount of $428.07

    (doc. # 39-2, ¶ 38; doc. # 48, ¶ 38).

20. Al Johnson was an engineer who did repair work on the television studio equipment, and the $150.00 check to him dated April 4, 2002 is an example of a check that Mr. Kail paid without first consulting with the management committee (doc. # 39-2, ¶ 39; doc. # 48, ¶ 39).

21. From April 2001 through December 2002, when NYN filed for bankruptcy, payments were made for rent for the station location, rent for transmitters, utilities, and net payroll (doc. # 39-2, ¶ 40, doc. # 48, ¶ 40).

22. Mr. Kail was never given written authorization to make any specific payment for NYN (doc. # 39-2, ¶ 33; doc. # 48, ¶ 33).

23. Mr. Wilkes' ongoing instruction was to keep the station operating and on the air (doc. # 39-2, ¶ 31; doc. # 48, ¶ 31).

24. When Mr. Kail took over as general manager from Mr. Schuyler, he was not told anything about payroll taxes (doc. # 38-1, ¶ 11(b); doc. # 50-1, ¶ 11(b)).

25. During Mr. Kail's tenure at NYN, payroll was funded by wire transfer from Mr. Wilkes to the NYN payroll account (doc. # 38-1, ¶ 12; doc. # 50-1, ¶ 12).

26. From April 6, 2001 to October 11, 2002, Mr. Wilkes transferred over $500,000 to NYN (doc. # 39-2, ¶ 29; doc. # 48, ¶ 29).

27. NYN paid out all of the money Mr. Wilkes transferred to the business from April 6, 2001 to October 11, 2002 (doc. # 39-2, ¶ 30; doc. # 48, ¶ 30).

28. For much of the time of Mr. Kail's employment at NYN, all payroll accounting was handled by a contractual service, Pay Data; however, Pay Data later dropped NYN as a customer when NYN failed to fully fund the payroll obligations, including making payroll tax payments (doc. # 38-1, ¶ 13; doc. # 50-1, ¶ 13).

29. After Pay Data ceased providing payroll services to NYN, the bookkeeper, Ms. Julien, prepared payroll tax returns (doc. # 38-1, ¶ 15; doc. # 50-1, ¶ 15).

30. Mr. Kail never prepared any NYN tax returns (doc. # 38-1, ¶ 14; doc. # 50-1, ¶ 14).

31. Mr. Kail was never an officer or member of NYN, and never owned any shares in NYN (doc. # 38-1, ¶ 16; doc. # 50-1, ¶ 16).

32. Mr. Kail was not authorized to sign or initiate company loans or to open corporate bank accounts (doc. # 38-1, ¶ 18; doc. # 50-1, ¶ 18).

33. Mr. Kail made repeated and frequent requests for sufficient capital to fund NYN, including funds for total payroll expenses (doc. # 38-1, ¶ 20; doc. # 50-1, ¶ 20).

34. Mr. Kail believed that Mr. Wilkes was responsible for payment of payroll taxes of NYN (doc. # 38-1, ¶ 21; doc. # 50-1, ¶ 21).

35. Prior to December 2002, when NYN filed for bankruptcy, NYN received notices from the IRS regarding its unpaid withheld taxes, which Mr. Kail saw and forwarded to the management committee; during his employment at NYN, Mr. Kail forwarded all notices received from the IRS regarding unpaid employment taxes directly to the management committee (doc. # 38-1, ¶ 22; doc. # 39-2, ¶ 62; doc. # 48, ¶ 62; doc. # 50-1, ¶ 22).

36. Mr. Kail was never given written instructions not to pay income or FICA taxes withheld from the wages of NYN's employees (doc. # 39-2, ¶ 32; doc. # 48, ¶ 32).

37. Mr. Kail was repeatedly told that the payroll taxes would be paid (doc. # 38-1, ¶ 23; doc. # 50-1, ¶ 23).

38. During the summer of 2001, NYN's payroll tax issue was discussed in a conference call between Mr. Kail, Mr. Wilkes, and the company's CPA, Ron Conigliario, who emphasized that the payroll taxes must be paid (doc. # 39-2, ¶ 42; doc. # 48, ¶ 42).

39. In a memorandum dated June 25, 2001 to Messrs. Wilkes, Cox, Ploof, and Don DuBois ("Mr. DuBois"), Mr. Kail stated that "we are 2 months ($23,000) behind in payroll taxes" (doc. # 39-2, ¶ 43; doc. # 48, ¶ 43).

40. In a memorandum dated July 26, 2001, to Messrs. Wilkes, Cox, Ploof, and DuBois, Mr. Kail listed NYN's "pressing financial issues" as the following:

  a. "8/1 payroll $20,000";
  b. "Payroll taxes for 2nd 1/4 $37,000";
  c. "Insurance $12,000 to reinsure"; and
  d. "WBVT Reorg expense $7,000"

  (doc. # 39-2, ¶ 44; doc. # 48, ¶ 44).

41. In a memorandum to Mr. Wilkes, dated August 14, 2001, Mr. Kail reported the following:

  a. "Sales for July were $50,947.44";
  b. "Sales last week totaled $35,750;"

5

    c. "Receivables are currently $88,953.41;" and

    d. "Immediate issues are: the 8/15 payroll of $23,000 (including commissions); and, the 8/15 payment to Adelphia of $16,118. I can cover $5,000 of the Adelphia payment. Obviously, there are many other [accounts payable] issues, including payroll taxes. . . However, these are the critical issues"

(doc. # 39-2, ¶ 45; doc. # 48, ¶ 45).

42. In a memorandum to Mr. Wilkes, dated September 25, 2001, Mr. Kail reported the following: "July revenue reached $51,000 and August revenues were $61,000. Through August, our two person staff has generated $313,257 in sales (+27% YTD) and are on pace to exceed $500,000 for the year. Weekly sales over the last quarter have averaged $16,998, including $30,212 over the last 2 weeks. Receivables as of 09/21/01 are $64,189" (doc. # 39-2, ¶ 46; doc. # 48, ¶ 46).

43. The September 25, 2001 memorandum also referenced NYN's "un-paid payroll taxes" (doc. # 39-2, ¶ 47; doc. # 48, ¶ 47).

44. In a memorandum dated November 6, 2001, to Mr. Wilkes, Mr. Kail summarized payments that needed to be made as follows: "To summarize: I need $5,000 by noon Friday or ETV will cut power on Rutland; ABS will be 30 days past-due on Wed ($16,114); WFXT wants the 01 Red Sox fee or they won't renew for 02 ($19,715); and the IRS wants a minimum of $27,899 for the 2nd quarter. There is much more including rent ($3,600), site leases, etc." (doc. # 39-2, ¶ 48; doc. # 48, ¶ 48).

45. In a memorandum to Mr. Wilkes and David Walsh, dated November 29, 2001, Mr. Kail gave a report that included the following: "I am always asked about sales . . . and all things considered, sales are excellent. We are up 22% YTD vs. last year. And, we have done it while operating in survival mode. We have done it without being able to hire additional staff. We have done it when the sales staff spends half their time collecting money to put out some fire. We have done it when 2/3 of my time has been spent trying to raise money . . . instead of building the business" (doc. # 39-2, ¶ 49; doc. # 48, ¶ 49).

46. Mr. Kail attached a list of "Critical A/P issues as of 11/29/01" to the November 29, 2001 memorandum; one of the accounts payable listed was "I.R.S. 6/30/01 Filing $27,899.37" (doc. # 39-2, ¶ 50; doc. # 48, ¶ 50).

47. In a memorandum to Mr. Wilkes, dated January 22, 2002, Mr. Kail referred to collection of $10,991 of $105,000 in accounts receivable; the memorandum also referred to the "issue of payroll taxes and the IRS, which is likely to surface any day" (doc. # 39-2, ¶ 51; doc. # 48, ¶ 51).

6

48. In a memorandum to the management committee, dated April 23, 2002, Mr. Kail referenced "$20,000 in new sales on the books" and "unpaid wages and payroll taxes" (doc. # 39-2, ¶ 52; doc. # 48, ¶ 52).

49. In a memorandum to Messrs. Wilkes, Cox, and Ploof, dated April 26, 2002, Mr. Kail stated that he "forwarded to Jeff [Loper] a copy of a communication from the IRS regarding 941 (payroll taxes)" (doc. # 39-2, ¶ 53; doc. #48, ¶ 53).

50. In a memorandum to Messrs. Wilkes, Cox, and Ploof, dated July 8, 2002, Mr. Kail stated the following:

   a. "We received $5,000 from David on Monday the 8th which covered one half of the June 15 payroll. Fortunately, we were able to collect enough to give everyone a paycheck, except Charles Kail";

   b. He had "used every bit of credibility to keep this place alive until a deal could be closed" and had "paid bills and put out fires and not taken paychecks and taken partial paychecks"; and

   c. "We have $2,500 due for the 7/1 rent for the office/studio. I was able to get the landlord to reduce the rent more than $2,000 per month"

   (doc. # 39-2, ¶¶ 54–56; doc. # 48, ¶¶ 54–56).

51. In a memorandum to Mr. Wilkes, dated August 13, 2002, Mr. Kail listed "$143,167 in payroll taxes due" (doc. # 39-2, ¶ 57; doc. # 48, ¶ 57).

52. In a memorandum to Messrs. Wilkes, Cox, and Ploof, dated September 10, 2002, Mr. Kail summarized "the immediate financial issue" with a list of ten items that did not include the unpaid payroll taxes, as follows:

   a. "Channel 39 Tube (it's un-watchable) $4,000";
   b. "McEwing Services $7,500 Minimum we are off the air";
   c. "Lightdhip (telephone service) $2,100";
   d. "September 15 payroll $8,800";
   e. "September lease (studio) $2,500";
   f. "August lease St Albans $1,000";
   g. "Tape deck repair $3,500";
   h. "Adelphia Bus Solutions $5,000";
   i. "Charles Kail, Consultant $5,000 Against Due of $17,279.20"; and
   j. "Columbia Tri-Star $5,000"

   (doc. # 39-2, ¶ 58; doc. # 48, ¶ 58).

7

53. Mr. Kail subsequently noted in the September 10, 2002 memorandum that "[t]here are many other payables, however, these are the most pressing . . . . This does not include taxes, 401K contributions etc." (doc. # 39-2, ¶ 58; doc. # 48, ¶ 58).

54. In a memorandum to Messrs. Wilkes and Cox, dated October 8, 2002, Mr. Kail stated as follows:

    a. "David wired $20,000 on Friday afternoon the 27th" and "$5,000 of the wire went to cover commissions to Johnny and Scott and $2,260 in regulatory fees to the FCC. And $5,000 was wired to Columbia to keep our 6.5 hours a day of programming"; and

    b. If no more funding is available, "it is time to close the doors, However, the employees still need to be paid . . . approximately $30,000 to bring them current, and another $15,000 including me. The rest can be sorted out by the Courts and the IRS"

    (doc. # 39-2, ¶ 59; doc. # 48, ¶ 59).

55. In a memorandum to Messrs. Wilkes and Cox, dated November 18, 2002, Mr. Kail listed "Gross wages due employees $43,528.03" and "IRS/VT withholding $159,787.29 plus penalties/interest" as "Priority Liabilities at shut-down or in a Bankruptcy" (doc. # 39-2, ¶ 60; doc. # 48, ¶ 60).

56. In the November 18, 2002 memorandum, Mr. Kail stated the following:

    a. "Johnny and I were able to make a deal last week with Shop at Home that will pay us $2,400 per week"; and

    b. "I will expect to collect my fee from the Shop at Home payments while they last. The balance of the fees will go to paying Johnny . . ."

    (doc. # 39-2, ¶ 61; doc. # 48, ¶ 61).

57. NYN reported $481,756 in gross receipts or sales and $484,484 in total income on its income tax return for the 2001 income tax year (doc. # 39-2, ¶ 28; doc. # 48, ¶ 28).

58. Mr. Kail stated that he resigned as general manager on February 5, 2002, but agreed to continue as a consultant and continued most of his duties as general manager until November 2002 (doc. # 39-2, ¶ 41; doc. # 48, ¶ 41).

59. On December 27, 2002, NYN filed a bankruptcy petition in this Court (doc. # 39-2, ¶ 7; doc. # 48, ¶ 7).

60. A delegate of the Secretary of the Treasury made assessments against Mr. Kail, pursuant to 26 U.S.C. § 6672, in connection with NYN's unpaid income and FICA taxes withheld from the wages of NYN's employees for the tax periods ending June 30, 2001 through September 30, 2002, as follows:

    a. A delegate made an assessment on August 17, 2005, for the tax periods ending on June 30, 2001, September 30, 2001, December 31, 2001, and March 31, 2002; and

8

b. A delegate made an assessment on April 30, 2007, for the tax periods ending on June 30, 2002, and September 30, 2002

(doc. # 39-2, ¶ 1; doc. # 48, ¶ 1).

61. On the date of each assessment, the IRS served statutory notice of the assessment and demand for its payment upon Mr. Kail (doc. # 39-2, ¶ 2; doc. # 48, ¶ 2).

62. The assessed liabilities remain unpaid in the following amounts as of December 17, 2010:
   a. There is a balance due of $32,621.83 for the tax period ending on June 30, 2001;
   b. There is a balance due of $27,745.18 for the tax period ending on September 30, 2001;
   c. There is a balance due of $29,278.21 for the tax period ending on December 31, 2001;
   d. There is a balance due of $22,805.23 for the tax period ending on March 31, 2002;
   e. There is a balance due of $18,703.12 for the tax period ending on June 30, 2002; and
   f. There is a balance due of $21,211.87 for the tax period ending on September 30, 2002

(doc. # 39-2, ¶ 3; doc. # 48, ¶ 3).

63. The total balance due on the 26 U.S.C. § 6672 liabilities is $152,365.44, plus statutory interest and additions from December 17, 2010 (doc. # 39-2, ¶ 4; doc. # 48, ¶ 4).

Additionally, based upon the record in this case and adversary proceeding, and pursuant to Vt. LBR 7056-1(a)(3), the Court finds the following facts relating to the equitable subrogation issue to be material and undisputed:

A. On February 24, 2000, the Debtors acquired real property located at 137 Cumberland Road, Burlington, Vermont, as tenants by the entirety (the "Property") (doc. # 37-2, ¶ 1; doc. # 49, p. 2).

B. On May 10, 2001, a lien on the Property held by Mortgage Electronic Registration Systems as nominee for Provident Funding was recorded in the City of Burlington Land Records (the "Provident Lien") (doc. # 37-2, ¶ 5; doc. # 49, p. 2).

C. On March 24, 2004, a lien on the Property held by VFCU was recorded in the City of Burlington Land Records (the "Prior VFCU Lien") (doc. # 37-2, ¶ 6; doc. # 49, p. 2).

D. On May 5, 2006, a Notice of Federal Tax Lien was recorded in the amount of $83,064.62 ("First Federal Tax Lien") (doc. # 37-2, ¶ 7; doc. # 49, p. 2).

E. The IRS's proof of claim states that the current civil penalties covered by the First Federal Tax Lien total $106,152.01, including interest (doc. # 37-2, ¶ 7; doc. # 49, p. 2).

F. On January 24, 2007, the Debtors executed and delivered to VFCU a promissory note in the principal amount of $187,700.00 (the "VFCU Loan") (doc. # 37-2, ¶ 2; doc. # 49, p. 2).

G. The promissory note was secured by a mortgage deed also executed and delivered to VFCU by the Debtors on January 24, 2007 (the "VFCU Mortgage") (doc. # 37-2, ¶ 3; doc. # 49, p. 2).

9

H. On January 31, 2007, the VFCU Mortgage was recorded in the City of Burlington Land Records (doc. # 37-2, ¶ 4; doc. # 49, p. 2).

I. A portion of the VFCU Loan proceeds in the amount of $120,357.62 were used to satisfy the Provident Lien (doc. # 37-2, ¶ 5; doc. # 49, p. 2).

J. Another portion of the VFCU Loan proceeds in the amount of $52,673.65 were used to satisfy the Prior VFCU Lien (doc. # 37-2, ¶ 6; doc. # 49, p. 2).

K. On June 21, 2007, a second Notice of Federal Tax Lien was recorded in the amount of $9,322.16 ("Second Federal Tax Lien") (doc. # 37-2, ¶ 9; doc. # 49, p. 2).

L. The IRS claims that the total amount due on the Second Federal Tax Lien is now $12,623.55, including interest and penalties, for 1040 taxes (doc. # 37-2, ¶ 9; doc. # 49, p. 2).

M. On August 2, 2007, a third Notice of Federal Tax Lien was recorded in the amount of $32,841.40 ("Third Federal Tax Lien") (doc. # 37-2, ¶ 8; doc. # 49, p. 2).

N. The IRS's proof of claim states that the current civil penalties covered by the Third Federal Tax Lien total $37,679.31, including interest (doc. # 37-2, ¶ 8; doc. # 49, p. 2).

O. In October 2009, the Property was sold for $257,500.00 (doc. # 37-2, ¶ 10; doc. # 49, p. 2).

P. VFCU was paid $114,672.28 from the sale proceeds, and the remaining funds are being held in escrow (doc. # 37-2, ¶ 11; doc. # 49, p. 2).

Q. As of January 7, 2011, VFCU is owed $87,423.63 plus attorneys' fees (doc. # 37-2, ¶ 11; doc. # 49, p. 2).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the record shows no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056; see also Bronx Household of Faith v. Bd. of Educ. of the City of New York, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that no genuine issue of material fact exists. See Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004). A genuine issue exists only when "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The substantive law identifies those facts that are material; only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248. Factual disputes that are irrelevant or unnecessary are not material. Id. In making its determination, the court's sole function is to determine whether there is any material dispute of fact that requires a trial. Id. at 249; see also Palmieri v. Lynch, 392 F.3d 73, 82 (2d Cir. 2004). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. See Beth Israel Med. Ctr.

v. Horizon Blue Cross & Blue Shield of New Jersey, Inc., 448 F.3d 573, 579 (2d Cir 2006). If the nonmoving party does not come forward with specific facts to establish an essential element of that party's claim on which it has the burden of proof at trial, the moving party is entitled to summary judgment. See Celotex Corp., 477 U.S. at 323–25 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case"); see also Tufariello v. Long Island R. Co., 458 F.3d 80, 85 (2d Cir. 2006).

## DISCUSSION

The parties seek summary judgment on two issues: 1) whether Mr. Kail is liable to the IRS for penalties assessed under 26 U.S.C. § 6672 for the failure of NYN to pay employment taxes; and 2) whether Vice's 2007 mortgage has priority over the 2006 federal tax lien under the doctrine of equitable subrogation.

**1.    The parties are not entitled to summary judgment on the issue of whether Mr. Kail is liable to the IRS for penalties assessed under 26 U.S.C. § 6672 for the failure of NYN to pay employment taxes.**

VFCU and the Debtors seek a judgment declaring that Mr. Kail is not liable to the IRS because he is not a "responsible person" and did not "willfully" fail to comply with 26 U.S.C. § 6672 (doc. # 37-1, p. 4; doc. # 38, p. 5). By contrast, the IRS seeks summary judgment that Mr. Kail is liable to the IRS as a responsible person who willfully failed to comply with 26 U.S.C. § 6672 (doc. # 39-1, pp. 2–4). The IRS further argues that VFCU lacks standing to contest Mr. Kail's tax liability (doc. # 49, pp. 3–4). The Court will first address VFCU's standing, and then turn to Mr. Kail's liability under 26 U.S.C. § 6672.

**A.    *VFCU does not have standing to contest Mr. Kail's tax liability.***

The IRS argues that VFCU lacks standing and is not entitled to contest Mr. Kail's tax liability under 26 U.S.C. § 6672, citing Middlesex Sav. Bank v. Johnson, 777 F. Supp. 1024 (D. Mass. 1991) (doc. # 49, pp. 3–4). VFCU acknowledges that third parties generally lack standing to contest the tax liability of another, but argues that this is not always the case (doc. # 53, pp. 1–2).

In Middlesex, the facts were straightforward and the procedural posture was quite similar to the case at bar. Middlesex Savings Bank commenced an action after it foreclosed a lien against real estate owned by defendant Raymond Johnson, which resulted in surplus proceeds of over $56,000. Middlesex, 777 F.Supp. at 1026. The United States claimed a right to the surplus funds based on its alleged lien on Mr. Johnson's property arising from a federal tax assessment pursuant to 26 U.S.C. § 6672, and moved for summary judgment. Id. Three judgment creditors opposed the United States' motion for summary

11

judgment. Id. at 1028. The court stated the following in reaching its determination that the judgment creditors lacked standing to contest the validity of the tax assessment:

> Authority addressing a variety of related issues suggests that a third party may not collaterally challenge a tax assessment, and thus the assessment is conclusively presumed valid in an action under § 2420.[9] Generally, a third party lacks standing and "is not entitled to contest the tax liability of another." In re Campbell, 761 F.2d 1181, 1185–86, 56 A.F.T.R.2d (P-H) 5203 (6th Cir. 1985). The fact that a party may bear the ultimate economic burden as a result of payment of a tax does not make that party the taxpayer or establish standing. See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States IRS, 845 F.2d 139, 142 (7th Cir. 1988) (manufacturer is taxpayer of excise tax, even if passed on directly to consumer).
>
> [9] The authorities, however, are not entirely unequivocal. See generally Annotation, Right to Attack Merits of Assessment, in Proceeding Under 26 U.S.C. § 7403 to Enforce, or Under 28 U.S.C. § 2410 to Discharge, Federal Tax Lien, 100 A.L.R.2d 869 (1961 & Supp. 1983); Conclusiveness of the Merits of a Tax Assessment and the Congressional Policy of Summary Tax Collection, 71 Yale L.J. 1329 (1962).
>
> In a variety of contexts courts have recognized that tax assessments are not open to collateral attack by non-taxpayers. See Myers v. United States, 647 F.2d 591, 604, 48 A.F.T.R.2d (P-H) 5223 (5th Cir. Unit A June 1981) (citing Moyer v. Mathas, 458 F.2d 431, 434, 29 A.F.T.R.2d (P-H) 898 & n.4 (5th Cir. 1972)); see, e.g., Falik v. United States, 343 F.2d 38, 41–42, 15 A.F.T.R.2d (P-H) 566 (2d Cir. 1965) (§ 2410 permits third parties to inquire into validity of lien, as distinct from the underlying tax assessment); Graham v. United States, 243 F.2d 919, 922, 51 A.F.T.R. (P-H) 213 (9th Cir. 1957) (nontaxpayer may not question validity of tax assessment in action to foreclose tax liens). In addition, there is considerable authority suggesting that tax assessments are not subject to attack except by means of specifically provided procedures. See, e.g., United States v. Brosnan, 363 U.S. 237, 260, 4 L. Ed. 2d 1192, 80 S. Ct. 1108, 5 A. (1960) (Clark, J., dissenting) (dicta) (validity of tax may not be tested under § 2410 and § 7424 procedures); Arford v. United States, 934 F.2d 229, 232, 67 A.F.T.R.2d (P-H) 1135 (9th Cir. 1991) (merits of underlying tax assessments may not be challenged in quiet title actions); Pollack v. United States, 819 F.2d 144, 145, 60 A.F.T.R.2d (P-H) 5038 (6th Cir. 1987) (suit under § 2410 is proper only to contest procedural regularity of lien, not to challenge the underlying tax liability).
>
> Similarly, in an action for wrongful levy brought by a third party pursuant to 26 U.S.C. § 7426, the merits of the tax assessment are not subject to attack. Morris v. United States, 652 F. Supp. 120, 122, 58 A.F.T.R.2d (P-H) 5948 (M.D. Fla. 1986), aff'd, 813 F.2d 343, 59 A.F.T.R.2d (P-H) 919 (11th Cir. 1987). The IRC provides that for purposes of such an action, "the assessment of tax upon which the interest or lien of the United States is based shall be conclusively presumed to be valid." 26 U.S.C. § 7426(c).
>
> I conclude that as a general proposition, collateral attacks by third parties should not be permitted under the instant circumstances.[10] If one considers the tax assessment as similar to a judgment, see Bull v. United States, 295 U.S. 247, 260, 79 L. Ed. 1421, 55 S. Ct. 695, 15 A.F.T.R. (P-H) 1069 (1935), this prohibition is analogous to practices protecting the finality of judgments. See Myers, 647 F.2d at 604.
>
> [10] The Second Circuit has directly considered the scope of the inquiry into the validity of tax liens by a third party under § 2410. See Pipola v. Chicco, 274 F.2d 909, 5 A.F.T.R.2d (P-H) 756 (2d Cir. 1960). Pipola held that in a § 2410 action, purchasers of a taxpayer's realty could not question the assessment which was the basis of a lien on the property. Shortly thereafter, the Second Circuit announced Pipola was overruled in an opinion which held that a taxpayer may challenge the merits of a tax assessment in an action to enforce tax liens. United States v. O'Connor, 291 F.2d 520, 527, 7 A.F.T.R.2d (P-H) 1541 (2d Cir. 1961) (in suit under § 7403, assessment is presumptive but not conclusive). O'Connor created considerable confusion and

12

> some disagreement as to the extent to which it overruled Pipola. Compare, e.g., Quinn v. Hook, 231 F. Supp. 718, 721, 14 A.F.T.R.2d (P-H) 5136 (E.D. Pa. 1964) (district court opinion in Pipola has survived as the correct interpretation of § 2410), aff'd, 341 F.2d 920, 15 A.F.T.R.2d (P-H) 466 (3d Cir. 1965) and Cooper Agency, Inc. v. McLeod, 235 F. Supp. 276, 284, 14 A.F.T.R. (E.D.S.C. 1964) (O'Connor court did not intend to overrule holding in Pipola that non-taxpayer could not commence action under § 2410 and inquire into merits of assessment), aff'd, 348 F.2d 919, 16 A.F.T.R.2d (P-H) 5445 (4th Cir. 1965), with Sonitz v. United States, 221 F. Supp. 762, 12 A.F.T.R.2d (P-H) 5614 (D.N.J. 1963) (plaintiff in § 2410 action may challenge merits of tax assessment) and Falik v. United States, 206 F. Supp. 181, 10 A.F.T.R.2d (P-H) 5589 (E.D.N.Y. 1962) (third party may attack validity of lien, as distinct from assessment, under § 2410), rev'd, 343 F.2d 38, 15 A.F.T.R.2d (P-H) 566 (2d Cir. 1965).
>
> The Pipola court had reasoned that a challenge to the assessment by a third party was prohibited because the taxpayer himself could not test the validity of the assessment in a government action to enforce under § 7403. While O'Connor undermined the stated rationale of the Pipola decision, it did not necessarily dictate a different result. In fact, although it declined to address the issue as applied to the same circumstances as Pipola, the Second Circuit has more recently refused to permit a taxpayer to initiate a suit under § 2410 to challenge the validity of a tax assessment underlying a lien. Falik v. United States, 343 F.2d 38, 15 A.F.T.R.2d (P-H) 566 (2d Cir. 1965) (§ 2410 was not meant to enable challenges to tax assessments); cf. Remis v. United States, 172 F. Supp. 732, 733, 3 A.F.T.R.2d (P-H) 1588 (D. Mass. 1959) (Congress passed § 2410 to enable complete relief in certain circumstances, and not to create new jurisdiction in the federal courts to challenge tax assessments), aff'd, 273 F.2d 293, 5 A.F.T.R.2d (P-H) 575 (1st Cir. 1960).

The prompt collection of taxes is an essential governmental function, and to allow third parties "to raise the entire history of the tax assessment in question in a full adversary proceeding would result in a substantial impediment to a process that is designed to be swift and efficient." In re Campbell, 761 F.2d at 1186 (action arising from order authorizing entry to effect levy).[11] I decline to erect such an impediment in this proceeding.

> [11] Section 2410 waives the sovereign immunity of the United States so as to permit its joinder as a party in certain cases where a lien is involved. It seems unlikely that this waiver extends to permit an attack upon the merits of a tax assessment upon which a lien is based; for it to do so would undermine the general policy of judicial noninterference with tax collection.

Id. at 1029–30.

This Court agrees with the reasoning of the court in Middlesex and finds that, in the instant case, VFCU lacks standing as a third party to contest the validity of the IRS's tax assessment under 26 U.S.C. § 6672.[3] Accordingly, VFCU's motion for summary judgment that Mr. Kail is not liable to the IRS under 26 U.S.C. § 6672 is denied on the basis that VFCU lacks standing to contest the validity of the tax assessment.

### B. *The legal standard articulated by the Second Circuit in Winter v. United States applies in the instant case.*

The Court turns next to the Debtors' and the IRS's motions for summary judgment as to whether Mr. Kail is liable to the IRS under 26 U.S.C. § 6672. The Second Circuit has articulated the following legal standard with respect to 26 U.S.C. § 6672, in the context of a motion for summary judgment:

A. Substantive Legal Standards

---

[3] VFCU argues that Middlesex concerned a foreclosure action, which is not at issue here (doc. # 53, p. 2). However, the court in Middlesex concluded that the collateral attack by filed judgment creditors should not be permitted in the circumstances of that case, where the United States had moved for summary judgment pursuant to 26 U.S.C. § 6672 and the judgment creditors had opposed the motion for summary judgment. See Middlesex, 777 F.Supp. at 1026, 1028, 1030.

13

The Code requires employers to withhold income and FICA taxes from the wages of their employees. See 26 U.S.C. §§ 3102(a) (FICA taxes), 3402 (income taxes). Section 7501(a) of the Code requires employers to remit these withholding taxes to the IRS, see 26 U.S.C. § 7501(a), and IRS regulations require that these remittances be made on a quarterly basis. 26 C.F.R. §§ 31.6011(a)-1 (FICA taxes), 31.6011(a)-4 (income taxes). If an employer withholds taxes from its employees' wages, but does not remit those taxes to the IRS, the government credits the employees with having paid their taxes and may not seek to collect the unremitted taxes from them. Slodov v. United States, 436 U.S. 238, 243, 56 L. Ed. 2d 251, 98 S. Ct. 1778 (1978); Fiataruolo v. United States, 8 F.3d 930, 938 (2d Cir. 1993). Instead, to protect the government from losses sustained by an employer's failure to remit withholding taxes, section 6672 of the Code allows the IRS to shift liability for the unremitted taxes from the employer to each individual responsible for the failure to remit:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to [sic] a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

Thus, under section 6672(a), an individual may be held liable for unpaid withholding taxes if: (1) he or she was a "responsible person" for collection and payment of the employer's taxes; and (2) he or she "willfully" failed to comply with section 7501(a). Fiataruolo, 8 F.3d at 938. "The person against whom the IRS assesses a § 6672 tax penalty has the burden of disproving, by a preponderance of the evidence, the existence of one of these two elements." Id.

1. Responsible Person

In determining whether an individual is a "responsible person" within the meaning of section 6672(a), "the determinative question is whether the individual has significant control over the enterprise's finances." United States v. Rem, 38 F.3d 634, 642 (2d Cir. 1994) (internal quotations omitted). No single factor is dispositive in evaluating whether an individual has significant control; rather, the determination must be made in light of the totality of the circumstances. Id. The relevant circumstances include whether the individual:

> (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.

Id. (quoting Fiataruolo, 8 F.3d at 939).

"It is not necessary that the individual in question have the final word as to which creditors should be paid in order to be subject to liability under . . . section" 6672(a). Id. (internal quotations omitted). And while section 6672(a) is not meant to ensnare those who have mere "technical authority" or a "titular designation," the section encompasses all those individuals connected closely enough with the business to prevent the tax default

14

from occurring. Id. As a result, "more than one individual may be a responsible person within the meaning of § 6672(a)." Id.; see also Fiataruolo, 8 F.3d at 939 ("Significant control may be shared by several people within a company, all of whom may be found responsible for a tax delinquency.").

2. Willfulness

Even a responsible person may not be held personally liable under section 6672(a) unless his or her failure to collect, account for, or remit withholding taxes was willful. 26 U.S.C. § 6672(a). In order to satisfy the willfulness requirement, a responsible person need not act out of an evil motive or an intent to defraud. Rem, 38 F.3d at 643. Instead, "the principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead." Id. Thus, failures are willful within the meaning of section 6672(a) if they are "'voluntary, conscious and intentional as opposed to accidental decisions not to remit funds properly withheld to the Government.'" Kalb v. United States, 505 F.2d 506, 511 (2d Cir. 1974) (quoting Monday v. United States, 421 F.2d 1210, 1216 (7th Cir. 1970)). "Willful conduct may also include a 'reckless disregard for obvious and known risks' as well as a 'failure to investigate . . . after having notice that withholding taxes have not been remitted to the Government.'" United States v. Landau, 155 F.3d 93, 101 (2d Cir. 1998) (quoting Kalb, 505 F.2d at 511).

That said, this Circuit recognizes a so-called "reasonable cause" exception to section 6672(a) liability: "[A] responsible person's failure to cause the withholding taxes to be paid is not willful if he [or she] believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one." Rem, 38 F.3d at 643 (citing Kalb, 505 F.2d at 511). However, even if a responsible person did not know contemporaneously of the company's nonpayment of withholding taxes, he or she will be held liable for any nonpayment if, when he or she became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes. Id.

B. Summary Judgment Principles

. . . In the context of a section 6672(a) dispute, then, summary judgment is appropriate where there are no genuine questions as to the assessed individual's control of company funds and decision-making authority, his or her knowledge of the deflection of company funds to payees other than the IRS, or the existence or reasonableness of his or her belief that the taxes were, in fact, being paid. See Rem, 38 F.3d at 644.

Winter v. United States, 196 F.3d 339, 344–46 (2d Cir. 1999).

This Court shall apply the legal standard set forth in Winter to determine whether either the Debtors or the IRS are entitled to summary judgment on the question of whether Mr. Kail is liable to the IRS as a "responsible person" who "willfully" failed to comply with 26 U.S.C. § 6672.

### C. *There is a genuine issue of material fact as to whether Mr. Kail is a "responsible person" under 26 U.S.C. § 6672.*

The Debtors argue that the undisputed material facts demonstrate that Mr. Kail is not a responsible person under 26 U.S.C. § 6672 as a matter of law (doc. # 38, pp. 6–12). By contrast, the IRS argues that the undisputed material facts show that Mr. Kail is a responsible person under 26 U.S.C. § 6672 (doc. # 39-1, pp. 4–7). The Court finds that there is a genuine issue of material fact as to both Mr. Kail's control

15

of company funds and the scope of his decision-making authority. Therefore, neither party is entitled to summary judgment on the question of whether Mr. Kail is a responsible person under 26 U.S.C. § 6672.

It is undisputed that when Mr. Kail took over as general manager on April 16, 1999, he accepted check signing authority over NYN's bank accounts (see Undisputed Material Facts ¶¶ 4, 9, supra). Additionally, the undisputed material facts show that Mr. Kail was active in the management of day-to-day affairs of NYN. As general manager, Mr. Kail worked on building sales and oversaw the operation of NYN's property; his work typically consisted of making sales calls with sales managers, dealing with programming issues at the station, and contacting vendors and advertisers, and he spent approximately 50–60% of his time on the telephone with advertisers, vendors, and NYN's members (see Undisputed Material Facts ¶¶ 4, 6, supra). Mr. Kail was at the television station on a daily basis, multiple personnel reported to him, and no one on-site at the television site had authority over him (see Undisputed Material Facts ¶¶ 7, 10, 12, supra). Even after Mr. Kail resigned as general manager on February 5, 2002, he agreed to continue as a consultant and continued most of his duties as general manager until November 2002 (see Undisputed Material Facts ¶ 58, supra). Taken alone, these factors would support a determination that Mr. Kail was a responsible person for purposes of 26 U.S.C. § 6672.

However, it is also undisputed that Mr. Kail is not an officer or member of NYN and never owned any shares in NYN (see Undisputed Material Facts ¶ 31, supra). This factor would support a determination that Mr. Kail was not a responsible person for purposes of 26 U.S.C. § 6672. Although Mr. Kail never hired or fired any employees at NYN (see Undisputed Material Facts ¶ 11, supra), the parties disagree as to whether he had the ability to do so. The Debtors assert that Mr. Kail did not have the authority to hire or fire any personnel absent prior approval of the management committee (doc. # 38-1, ¶ 17). The IRS disputes this, and asserts that Mr. Kail could hire or fire employees (doc. # 50-1, ¶ 17). Moreover, there is a factual dispute as to the question of whether Mr. Kail made decisions regarding which, when, and in what order outstanding debts or taxes would be paid, or exercised control over daily bank accounts and disbursement records.

With respect to the question of whether Mr. Kail made decisions regarding which, when, and in what order outstanding debts or taxes would be paid, it is undisputed that Mr. Kail received directives from members of the management committee for payment of certain bills and as to how certain funds were to be allocated (see Undisputed Material Facts ¶ 12, supra). It is also undisputed that Mr. Kail used his check signing authority to pay vendors, such as UPS Delivery or Federal Express, because those vendors required immediate payment, and that Mr. Kail signed checks on behalf of NYN that included: a check dated April 4, 2002 to Al Johnson in the amount of $150.00; a check dated August 12, 2002 to North Valley Cable in the amount of $225.00; a check dated September 6, 2002 to a NYN employee in the amount of $594.46; and a check dated September 11, 2002 to Central Vermont Public Service in the

16

amount of $428.07 (see Undisputed Material Facts ¶¶ 17–19, supra). It is undisputed that Al Johnson was an engineer who did repair work on the television studio equipment, and that Mr. Kail paid the $150.00 check to him without first consulting with the management committee (see Undisputed Material Facts ¶ 20, supra). It is further undisputed that, while Mr. Kail was never given written authorization to make a specific payment for NYN, Mr. Wilkes' ongoing instructions were to keep the station operating and on the air (see Undisputed Material Facts ¶ 22–23, supra).

      The Debtors argue that most of the checks Mr. Kail wrote were written at the express direction of the management committee, specifically Mr. Wilkes, and that Mr. Kail's instructions were to pay all accounts that would keep the station operating, i.e., utilities and vendors that provided operating services and to "keep people working" (doc. # 38, p. 11). The Debtors assert that, aside from checks for delivery services, all other checks signed by Mr. Kail were pursuant to directives from the management committee (doc. # 38-1, ¶ 8). The IRS disputes the Debtors' assertion, arguing that Mr. Kail made many other payments, beyond delivery services, without first consulting the management committee (doc. # 50-1, ¶ 8; doc. # 54, pp. 5–6). The IRS asserts that Mr. Wilkes did not give a specific designation as to how Mr. Kail was to spend the money Mr. Wilkes transferred to NYN (doc. # 39-2, ¶ 31). The Debtors fervently dispute this, asserting that Mr. Wilkes instructed Mr. Kail to pay employees and to not allow utility shut-offs (doc. # 48, ¶ 31). A review of these facts persuades the Court that the facts are in dispute as to whether Mr. Kail made the salient payments based upon the ongoing instructions of the management committee, or on his own authority. These facts are material to the question of whether Mr. Kail made decisions regarding which, when, and in what order outstanding debts or taxes would be paid.

      There are also material facts in dispute with regard to Mr. Kail's role in prioritizing the order in which creditors would be paid. It is undisputed that Mr. Kail sent a number of memoranda to, inter alia, members of the management committee, including Mr. Wilkes, from June 25, 2001 to November 18, 2002 concerning NYN's financial issues, including outstanding debts and taxes (see Undisputed Material Facts ¶¶ 39–56, supra). The Debtors argue that Mr. Kail sent emails to the management committee apprising them of NYN's financial situation (doc. # 38, p. 8), and that Mr. Kail reported on the financial status of NYN, but did not decide the priority of payables (doc. # 47, p. 3). The IRS argues that Mr. Kail closely monitored NYN's financial status, regularly updated the management committee, and prioritized which creditors should be paid, including deciding that other creditors should be paid before the IRS (doc. # 39-1, pp. 5–6). The Court finds that, although the content of the memoranda is not in dispute, the facts are in dispute as to whether the purpose of Mr. Kail's reports to the management committee was informational rather than directive, and whether their purpose was to set forth a determination as to which debts should be paid. This Court further finds that the purpose of the memoranda is material to the

17

question of whether Mr. Kail made decisions regarding which, when, and in what order outstanding debts or taxes would be paid.

With respect to whether Mr. Kail exercised control over daily bank accounts and disbursement records, it is undisputed that the checkbooks for NYN's bank accounts were kept at the television station and Mr. Kail had access to them, and that Mr. Kail wrote checks from the company checkbook, which either he or the part-time bookkeeper, Ms. Julien, prepared (see Undisputed Material Facts ¶¶ 15–16, supra).  It is also undisputed that Mr. Kail was not authorized to sign or initiate company loans or to open corporate bank accounts, and that he made repeated and frequent requests for sufficient capital to fund NYN, including funds for total payroll expenses (see Undisputed Material Facts ¶¶ 32–33, supra).

The Debtors argue that Ms. Julien kept all of the accounting records and that anyone leaving the office would drop off deposits (doc. # 38, p. 7), but the record of undisputed material facts does not include any information as to who kept accounting records and dropped off deposits.  The IRS argues that Mr. Kail was the only one signing checks for NYN during the periods in question (doc. # 39-1, p. 5), asserting that, although Mr. Kail believed that Mr. Ploof may have also had check signing authority, Mr. Ploof never signed any checks for NYN while Mr. Kail worked for NYN, and Mr. Kail was the only one signing checks for NYN from April 16, 1999 to December 2002 (doc. # 39-2, ¶¶ 26–27).  The Debtors dispute the IRS's assertion that Mr. Ploof never signed checks, and indicate that another person, Jeff Loper, may have signed checks (doc. # 48, ¶¶ 26–27).  The Court thus finds that the facts are in dispute as to whether Mr. Kail exercised control over daily bank accounts and disbursement records.

Based upon the totality of the circumstances in this case, the Court finds that there is a genuine issue of material fact as to Mr. Kail's control of company funds and decision-making authority, and thus whether he is a responsible person under 26 U.S.C. § 6672.  Additionally, the Court finds that certain other facts, which are material and essential to a determination of this issue, are missing from the record.  Accordingly, the Debtors' and the IRS's motions for summary judgment as to whether Mr. Kail is liable to the IRS under 26 U.S.C. § 6672 are denied.

> D. *The Court need not reach the question of whether Mr. Kail "willfully" failed to comply with 26 U.S.C. § 6672 as a matter of law.*

Since the Court has denied the Debtors' and the IRS's motions for summary judgment on the basis that there is a genuine question of material fact as to whether Mr. Kail is a responsible person under 26 U.S.C. § 6672, there is no need for the Court to address the issue of whether Mr. Kail willfully failed to comply with 26 U.S.C. § 6672 as a matter of law.

2. **VFCU is not entitled to summary judgment that the 2007 VFCU mortgage takes priority over the 2006 federal tax lien pursuant to the doctrine of equitable subrogation.**

The Court finds that there are no material facts in dispute with respect to the issue on which VFCU seeks relief, and therefore summary judgment is proper.

Turning to the merits, VFCU argues that the VFCU Mortgage should take priority over the IRS's First Federal Tax Lien pursuant to the doctrine of equitable subrogation, because a portion of the proceeds from the VFCU Loan were used to pay off two mortgages on the Property that were recorded prior to the First Federal Tax Lien (doc. # 37-1, pp. 4–5). The gravamen of the IRS's opposition is that the doctrine of equitable subrogation is limited to involuntary payments by parties that are secondarily liable (doc. # 49, p. 7). The IRS is correct.

This Court has previously explained the circumstances under which the principle of equitable subrogation applies:

> Equitable subrogation arises in equity to prevent fraud or injustice and usually arises when (1) the paying party has a liability, claim or fiduciary relationship with the debtor; (2) the party pays to fulfill a legal duty or because of public policy; (3) the paying party is a secondary debtor; (4) the paying party is a surety; or (5) the party pays to protect its own rights or property.

In re Hutchins, 400 B.R. 403, 413 (Bankr. D. Vt. 2009) (quoting Lawlor v. Chittenden Trust Co. (In re Lawlor), 2005 Bankr. LEXIS 2935, 2005 WL 4122833, *2 (Bankr. D. Vt. Dec. 15, 2005)). "This equitable doctrine, which has as its goal the advancement of justice and the prevention of injustice, is used 'only in extreme cases bordering on if not reaching the level of fraud.'" Id. (citing Rouse v. Chase Manhattan Bank, U.S.A. (In re Brown), 226 B.R. 39, 44 (W.D.Mo. 1998)). In its earlier ruling, the Court specifically addressed the purpose equitable subrogation is intended to serve:

> Subrogation is an equity called into existence for the purpose of enabling a party secondarily liable, but who has paid the debt, to reap the benefit of any securities or remedies which the creditor may hold against the principal debtor and by the use of which the party paying may thus be made whole. It is a doctrine which has particular approval in Vermont as between insurer and insured. Subrogation arises when one man is compelled to pay a debt for which another is primarily liable and which, in good conscience, should have been discharged by the latter. Subrogation is an equity creature akin to and derived from the law of unjust enrichment and restitution.
>
> The general rule is that an obligor or insurer making a payment for which it is not liable is making a 'voluntary' payment and cannot be subrogated. Although the general rule has not been applied specifically to insurance law by Vermont, the rule is applied in Vermont to general equitable rights of subrogation and restitution.
>
> It is not disputed by the parties that one is a volunteer if he pays while under no obligation to pay or when no interest of his is protected by payment. The problem presented is determining what is a 'volunteer' in any particular factual situation.
>
> Equity rules are not absolute and competing equities must be considered in any subrogation-restitution situation. The subrogee must have clear equity and subrogation is defeated by countervailing equities. Subrogation will not be enforced to the prejudice of equal or higher rights.

19

Id. at 414 (citation omitted).

It is undisputed that the VFCU Mortgage was recorded on January 31, 2007, and that the IRS's First Federal Tax Lien was recorded on May 5, 2006 (see Undisputed Material Facts ¶¶ D, H, supra). It is also undisputed that a portion of the VFCU Loan proceeds were used to satisfy the Provident Lien recorded on May 10, 2001, and the Prior VFCU Lien recorded on March 24, 2004 (see Undisputed Material Facts ¶¶ B–C, I–J, supra). VFCU argues that it is not a "volunteer" because it was protecting its interest in the Property (doc. # 53, p. 2). However, this Court has previously found that a mortgagee that made a loan of its own volition in reliance upon its own mortgage deed was a volunteer not entitled to equitable subrogation. See Bosley v. BAC Home Loan Servicing L.P. (In re Bosley), 446 B.R. 79, 84 (Bankr. D. Vt. 2011); see also Lawlor, 2005 Bankr. LEXIS 2935 at *10, 2005 WL 4122833 at *3. Similarly, in the instant case, VFCU made the $187,700.00 VFCU Loan voluntarily in reliance upon its own mortgage deed (see Undisputed Material Facts ¶ F, supra).

In sum, the Court finds that, under the undisputed material facts, VFCU is not entitled to judgment as a matter of law declaring that the VFCU Mortgage has priority over the IRS's First Federal Tax Lien under the doctrine of equitable subrogation. Therefore, the Court denies VFCU's motion for summary judgment on the equitable subrogation issue, on the merits.

## CONCLUSION

For the reasons set forth above, the Court finds that none of the parties have established grounds for entry of summary judgment.

The Court denies the IRS's and the Debtors' motions for summary judgment on the issue of whether Mr. Kail is liable to the IRS for penalties assessed under 26 U.S.C. § 6672 for the failure of NYN to pay employment taxes because there are material facts in dispute. A trial will be set on that issue. The Court denies VFCU's motion for summary judgment on the 26 U.S.C. § 6672 issue because VFCU lacks standing to contest the validity of the tax assessment.

With respect to VFCU's motion for summary judgment on the equitable subrogation issue, the Court finds that there are no material facts in dispute, determines that VFCU is not entitled to relief under the doctrine of equitable subrogation as a matter of law, and therefore denies, on the merits, VFCU's motion for a determination that the VFCU Mortgage has priority over the IRS's First Federal Tax Lien.

This memorandum of decision constitutes the Court's findings of facts and conclusions of law.

_____

July 22, 2011  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge